**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY REYNOLDS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| | ) | No. 11 C 6809 |
| v. | ) | |
| | ) | Judge George W. Lindberg |
| DAVE REDNOUR, Warden,[1] | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Anthony Reynolds' petition for writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. For the reasons stated below, the court denies the habeas petition and declines to certify any issues for appeal.

**I.** *Factual Background*

The following facts are taken from the February 5, 2010 decision of the Illinois Appellate Court on petitioner's direct appeal. *See* 28 U.S.C. § 2254(e)(1). On October 18, 2005, Harvey Police detectives Tony Debois and Harvey Lewis responded to a call that shots had been fired. *See People v. Reynolds*, No. 1-07-1944, slip op. at 6 (Ill. App. Ct. Feb. 5, 2010). When they reached the area in question, a group of residents told the detectives that the offender had gone east. *Id*. The detectives saw a man walking east, and attempted to stop and interview him. *Id*. The man pulled a handgun from his waist and pointed it at the detectives. *Id*. The detectives

---

[1] Michael Atchison has replaced Dave Rednour as warden of the Menard Correctional Center, the facility where petitioner is currently incarcerated. The court therefore substitutes Atchison as the respondent in this case. *See* Rule 2(a) of the Rules Governing Section 2254 Cases in the U.S. District Courts; Fed. R. Civ. P. 25(d).

began to fire on the man, who then fled. *Id*. The detectives called for backup and chased the man on foot. *Id*. The detectives testified at trial that as they were chasing the man, they saw him throw the gun. *Id*. A police sergeant stopped petitioner in a residential yard and took him into custody. *Id*. at 6-7. Detectives Debois and Lewis later identified petitioner in court as the man who had pulled the gun on them. *Id*. at 6.

Following a twenty-minute search, another police officer found the gun under a car in a vacant lot. *Id*. at 7. Detective Debois brought the gun to the police station, sealed it, and turned it over to Detective Dorrough. *Id*.

On June 23, 2006, while in custody at the Cook County Jail, petitioner was recorded having a telephone conversation with an unidentified woman. *Id*. at 2-3. During this conversation, petitioner and the woman had the following exchange:

> Pet.: Man, you and I both know that Derow [sic] sold me the fucking gun back, man, so how the fuck he gonna sit there and bring a gun to court? That's why I want to go to trial right now, man. Ain't no fucking gun. I know that. The lawyers don't know that shit. That's why, what's why I'm telling you and my father, bogus, man.
>
> Voice: [inaudible] cause your father just told him that when we was up in court Wednesday.
>
> Pet.: That's why I keep saying my father bogus. He ain't supposed to tell nobody shit.
>
> Voice: Well, he sure told --
>
> Pet.: He supposed --
>
> Voice: – the lawyer that he had the gun and if he want you all to bring it up there, he was gonna bring it up there. That's what your father told --
>
> Pet.: That's why I keep saying he bogus, man. He know what the fuck going on. He ain't supposed to say nothing. That's why I want a speedy trial. I know ain't no gun in evidence. So if there ain't gun in evidence how you

> gonna convict? That's what I'm saying. And that's why the state's attorney said they not ready cause they realized ain't no gun in trial cause my lawyer – my father done told my lawyer the shit and he done told them that. Well, you all don't have no gun, trying, trying to work a deal with them. Now, all of a sudden, they know ain't no gun. That's what the fuck I was saying in court, it's like everybody know what the fuck going on and they ain't suppose to. My only thing is steady coming back in the back talking about, well, yeah, your father he said he gonna use his out of town ID and come holler at you cause he feel like I feel, you need to slow down. I don't need to slow down shit. And [inaudible] he bogus cause he know ain't no gun in evidence.

*Id*. at 3-5.

On June 28, 2006, Detective Debois was subpoenaed to bring the gun to court. *Id*. at 7. He was unable to find it, however. *Id*. The Illinois State Police began an investigation, which ultimately resulted in Detective Dorrough's arrest for removing the gun from evidence. *Id*. The gun was recovered on October 22, 2006. *Id*.

The jury found petitioner guilty of unlawful possession of a weapon by a felon, aggravated unlawful possession of a weapon, and of being an armed habitual criminal. *Id*. Petitioner was sentenced to twenty years in prison for being an armed habitual criminal, and was sentenced to concurrent six-year and ten-year prison terms on the other charges. *Id*.

## II. *Procedural Background*

Petitioner filed a direct appeal. On February 5, 2010, the Illinois Appellate Court affirmed petitioner's conviction. *See Reynolds*, No. 1-07-1944, slip op. at 2. On May 26, 2010, the Illinois Supreme Court denied petitioner's petition for leave to appeal. *See People v. Reynolds*, 932 N.E.2d 1035 (Ill. 2010). The United States Supreme Court denied petitioner's petition for a writ of certiorari on October 12, 2010. *See Reynolds v. Ill.*, 131 S. Ct. 479 (2010).

Petitioner then filed the instant federal habeas petition, in which he raises the following

issues: (1) whether the trial court's admission of the recording of petitioner's June 23, 2006 telephone conversation violated petitioner's Sixth Amendment right to conflict-free counsel; (2) whether the admission of this evidence violated petitioner's due process right to a fair trial under *Napue v. Ill.*, 360 U.S. 264 (1959); (3) whether the trial court's refusal to allow petitioner to rebut this evidence violated his right to present a defense under *Chambers v. Mississippi*, 410 U.S. 284 (1973); and (4) whether petitioner established a *prima facie* case of racial discrimination in jury selection under *Batson v. Kentucky*, 476 U.S. 79 (1986).

### III.  Analysis

In order to prevail on a Section 2254 petition, a petitioner must show "that his detention was the result of a state court decision (1) 'contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;' or (2) 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Jones v. Basinger*, 635 F.3d 1030, 1040 (7th Cir. 2011) (quoting 28 U.S.C. § 2254(d)).  A state court's decision is "unreasonable" in this context "only if it is 'so erroneous as to be objectively unreasonable' and 'well outside the boundaries of permissible differences of opinion.'" *Bennett v. Gaetz*, 592 F.3d 786, 790 (7th Cir. 2010) (quoting *Emerson v. Shaw*, 575 F.3d 680, 684 (7th Cir. 2009)).

#### A.  *Claims Relating to the Admission of the June 23, 2006 Telephone Conversation*
##### 1.  *Sixth Amendment Right to Conflict-Free Counsel*

Petitioner argues that the trial court's admission of the portions of the June 23, 2006 telephone conversation relating to defense counsel's knowledge of the missing gun violated petitioner's Sixth Amendment right to conflict-free counsel.  First, petitioner contends that the

4

trial court failed to adequately investigate and remedy the alleged conflict, in violation of *Holloway v. Arkansas*, 435 U.S. 475 (1978). Petitioner also contends that the trial court's admission of the telephone conversation created a *per se* conflict of interest, because it placed defense counsel in the untenable position of arguing petitioner's innocence to the jury in the face of evidence of the attorney's own wrongdoing.

"The Sixth Amendment entitles a criminal defendant to representation by conflict free counsel." *U.S. v. Adkins*, 274 F.3d 444, 453 (7th Cir. 2001). In *Holloway v. Arkansas*, the Supreme Court required trial courts to adequately inquire into alleged conflicts of interest when a timely objection has been made. *See Holloway*, 435 U.S. at 483-84. However, the duty *Holloway* imposes is limited to situations in which the trial court "requires joint representation over a timely objection." *U.S. v. Lafuente*, 426 F.3d 894, 897 (7th Cir. 2005) (citing *Mickens v. Taylor*, 535 U.S. 162, 168-69 (2002)). Since this case did not involve joint representation, *Holloway* does not apply.

The court turns to petitioner's claim that the trial court's admission of the telephone conversation created a *per se* conflict of interest. A petitioner may establish a Sixth Amendment violation based of a conflict of interest in one of two ways. First, he may show that defense counsel acted under an actual conflict of interest, and the conflict adversely affected counsel's performance, under *Cuyler v. Sullivan*, 446 U.S. 335 (1980). Alternatively, he may show that counsel's representation fell below an objectively reasonable standard and that it is reasonably probable that the outcome would have been different but for counsel's errors, under *Strickland v. Washington*, 466 U.S. 668 (1984). *See Freeman v. Chandler*, 645 F.3d 863, 868-69 (7th Cir. 2011), *petition for cert. filed* (U.S. Sept. 19, 2011) (No. 11-9225). The Seventh Circuit does not

recognize "*per se*" conflicts of interest, which differ from "actual" conflicts of interest in that no showing of an adverse effect is required to establish a *per se* conflict. *See U.S. v. Wallace*, 276 F.3d 360, 367-68 (7th Cir. 2002); *Stoia v. U.S.*, 22 F.3d 766, 770 n.4 (7th Cir. 1994) ("We have been reluctant to recognize any *per se* Sixth Amendment violations and to date have not done so.").

In his direct appeal in the state court, petitioner argued only that the trial court's admission of the telephone conversation created a *per se* conflict; he did not raise an actual conflict claim or argue that the alleged conflict adversely affected defense counsel's performance. Illinois courts recognize *per se* conflicts of interest in certain limited situations, and require no showing that the conflict adversely affected counsel's performance in those situations. *See People v. Hernandez*, 896 N.E.2d 297, 303-04 (Ill. 2008). The *per se* conflict of interest rule was invented by the Illinois courts, and "does not appear in the United States Supreme Court case law." *See People v. Spreitzer*, 525 N.E.2d 30, 34 (Ill. 1988). This court concludes that petitioner's "*per se*" conflict claim is not cognizable on federal habeas review.

Petitioner did not raise an actual conflict of interest claim or an ineffective assistance of counsel claim in the state court, and his *per se* conflict claim is not the equivalent of such a claim. *See U.S. ex rel. Williams v. Ott*, No. 07 C 1815, 2009 WL 249365, at *9 (N.D. Ill. Feb. 2, 2009) (observing that "courts in this district have found that a petitioner who raises a *per se* conflict of interest claim under Illinois state law has not raised an actual conflict of interest claim for fair presentment purposes"). To the extent that he is attempting to raise a *Cuyler* or

6

*Strickland* claim here, those claims are procedurally defaulted.[2] *See Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010). In addition, petitioner has not shown a basis for excusing the default because he has not shown cause for the default and prejudice. *See id.* Petitioner's conflict of interest claim is denied.

### 2. Napue *Claim*

Petitioner also argues that the admission of the portion of the recording in which he discussed his attorney violated his due process right to a fair trial under *Napue v. Ill.*, 360 U.S. 264 (1959), because his conviction was obtained through the prosecution's knowing use of false evidence of defense counsel's wrongdoing. "[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Ill.*, 360 U.S. 264, 269 (1959). A new trial is required if petitioner establishes that: "(1) the prosecution presented false testimony or failed to disclose that false testimony was used to convict, (2) the prosecution knew or should have known that the testimony was false, and (3) there is a reasonable likelihood that the testimony could have affected the jury's judgment." *See Griffin v. Pierce*, 622 F.3d 831, 842 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 1507 (2011).

At trial, defense counsel objected to the admission of the portion of the conversation that referred to petitioner's lawyer, on the basis that it would effectively make the prosecutors and

---

[2] In addition, the court notes that it would not appear that an actual conflict existed, since both petitioner and the authorities were aware of defense counsel's alleged wrongdoing prior to trial. *See Cerro v. U.S.*, 872 F.2d 780, 785-86 (7th Cir. 1989) (rejecting defendant's claim that his attorney's involvement in defendant's criminal conspiracy created a conflict because the defendant "was clearly aware of the potential conflict well in advance of trial" and because the information about the attorney's criminal involvement "was already out of the bag"). Therefore, even if this court considered such an actual conflict claim on the merits, it would fail.

defense attorneys witnesses in the case to rebut the allegedly false statements regarding defense counsel's role.[3] *Reynolds*, No. 1-07-1944, slip op. at 5. The trial court admitted the entire conversation, and denied counsel's alternative motion to withdraw and to remove the prosecutors assigned to the case. *Id*. at 5-6. The trial court interpreted petitioner's recorded statements as not implicating defense counsel in an attempt to work a deal with the prosecution based on his knowledge of the missing gun:

> THE COURT: Mr. Reynolds' father – I just want to do this in a logical sequence with the proper grammatical references, as to conjugation, verb tense. "My father" meaning Mr. Reynolds' father, "told my lawyer," meaning [defense counsel], "the shit," meaning the gun, "and he," meaning, if you put it in the proper grammatical text, means Mr. Reynolds' father, "done told them that." There is no reference to the defense attorneys here whatsoever. If you take this in proper grammatical text, when the "he" refers back to the subject of the sentence, being the father, not the defense attorneys.

*Reynolds*, No. 1-07-1944, slip op. at 11-12. On direct appeal, the Illinois Appellate Court concluded that petitioner's "comments in this case regarding counsel's knowledge of the missing gun and attempt to 'work a deal' with the State were merely speculation. Defendant admitted at the outset of the conversation that he believed his lawyer did not know about the missing gun." *Id*. at 18.

Petitioner argues that the conversation impugned defense counsel's integrity in two ways. First, petitioner contends that the conversation showed that defense counsel took an active role in attempting to frustrate petitioner's prosecution, by using his knowledge about the gun to attempt to negotiate a deal with the prosecution. Second, petitioner contends that at the very least, the

---

[3] Defense counsel also objected to the admission of the entire conversation on relevancy grounds. *See Reynolds*, No. 1-07-1944, slip op. at 5. The prosecution responded that the conversation established petitioner's consciousness of guilt, and the trial court overruled the objection. *Id*.

8

conversation showed that defense counsel was involved in the plot to suppress the gun because counsel knew that petitioner had bought the gun back, but apparently took no action to recover it (as evidenced by the fact that the gun was recovered by the police months later).

The state court's factual findings are presumed to be correct, "unless the petitioner rebuts the presumption by clear and convincing evidence." *Morgan v. Hardy*, 662 F.3d 790, 797 (7th Cir. 2011), *cert. denied*, No. 11-966, 2012 WL 381892 (U.S. Mar. 19, 2012). This presumption also applies to factual findings made by a state appellate court based on the trial record. *Id.* at 797-98. "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 130 S. Ct. 841, 849 (2010).

The court first considers petitioner's argument that the trial court unreasonably concluded that the telephone conversation did not implicate defense counsel in an attempt to use the information about the gun to negotiate a deal with the prosecution. The trial court interpreted petitioner's statement, "my father done told my lawyer the shit and he done told them that," to mean that petitioner's father had talked to the prosecutors, rather than that defense counsel had done so. *See Reynolds*, No. 1-07-1944, slip op. at 11-12. This statement was ambiguous, and may equally well suggest that defense counsel, rather than petitioner's father, attempted to work out a deal with the prosecution. However, this court cannot say that the state court's conclusions on this point were unreasonable.

Next, the court examines the state court's factual determination that the conversation did not impugn defense counsel's integrity by suggesting that he knew about the gun. The state appellate court found that petitioner's comments indicated that prior to the telephone

9

conversation with the unidentified woman, petitioner believed that his lawyer was unaware that the gun was missing, and that in light of "the conversation as a whole," petitioner's comments regarding his attorney's alleged knowledge of the gun "amounted to speculation." *See Reynolds*, No. 1-07-1944, slip op. at 17. However, given that the unidentified woman in the conversation affirmatively stated that petitioner's father had told defense counsel about the gun, and petitioner responded in apparent concurrence, the appellate court's assessment of these comments as "speculative" was not reasonable. At minimum, this conversation was likely to have given the jury the impression that defense counsel knew that his client had bought back the gun. *See U.S. v. Freeman*, 650 F.3d 673, 679 (7th Cir. 2011) (in the *Napue* context, false testimony includes vague statements that give a false impression to the jury). Accordingly, the state appellate court's finding on this point was unreasonable.

Even if the conversation falsely suggested that defense counsel knew his client had bought back the gun, however, petitioner still must show that there was a reasonable likelihood that this evidence could have affected the jury's judgment. As the Illinois Appellate Court observed, petitioner does not contest that the trial court properly admitted the portions of the conversation in which petitioner admitted to buying the gun back in an effort to avoid prosecution. *See Reynolds*, No. 1-07-1944, slip op. at 18-19. The appellate court held that even if the conversation constituted false evidence of defense counsel's wrongdoing, there was not a reasonable likelihood that that evidence influenced the jury's verdict. *Id*. at 19.

This court finds that this conclusion was reasonable. This court is not persuaded by petitioner's argument that it was the "sensational evidence implicating counsel in the plot" that would have captured the jury's attention; indeed, it is more reasonable to conclude that it was the

evidence that petitioner had bought the gun back in an attempt to derail his prosecution that was "devastating" to the defense case. It was not unreasonable for the state appellate court to conclude that petitioner's admission that he had bought the gun back, coupled with the police detectives' identification of petitioner as the person who had pointed a gun at them, overwhelmingly established petitioner's guilt. Therefore, this court concludes that even if the telephone conversation falsely suggested that defense counsel knew his client had bought back the gun, the state court did not unreasonably apply *Napue* because petitioner has not shown that it was reasonably likely that the evidence affected the jury's judgment. Petitioner's *Napue* claim is denied.

### 3. *Right to Present a Defense*

Petitioner also argues that the trial court's refusal to permit defense counsel to rebut the evidence of counsel's alleged wrongdoing violated petitioner's right to present a defense under *Chambers v. Miss.*, 410 U.S. 284 (1973). The Sixth Amendment guarantees criminal defendants "the right to put before a jury evidence that might influence the determination of guilt." *Taylor v. Ill.*, 484 U.S. 400, 408 (1988). This is not an absolute right, however. *See Hammer v. Karlen*, 342 F.3d 807, 811 (7th Cir. 2003). Rather, the trial court may limit a defendant's right to present evidence, unless doing so "would unduly impair his or her ability to present a reasonable defense." *Id*. at 811-12.

The Illinois Appellate Court concluded that even if the trial court erred in not allowing defense counsel to rebut evidence of his alleged wrongdoing, such error was harmless because the evidence against petitioner was overwhelming, and "impeachment of a small portion of defendant's incriminating statement would [not] have had any meaningful impact on the ultimate

11

result of defendant's trial." *Reynolds*, No. 1-07-1944, slip op. at 24. This court finds that the state appellate court's conclusion was not unreasonable. Even if the telephone conversation impugned defense counsel's integrity by suggesting that he knew that petitioner had bought back the gun, it was reasonable to conclude that testimony rebutting this collateral point would not have affected the jury's decision. Therefore, the trial court's decision not to permit such testimony did not unduly impair petitioner's right to present a reasonable defense. This claim is also denied.

### B. *Jury Selection*

Finally, petitioner argues that the Illinois Appellate Court unreasonably determined that petitioner failed to establish a *prima facie* case of discrimination in jury selection under *Batson v. Kentucky*, 476 U.S. 79 (1986). During jury selection, defense counsel made an oral *Batson* motion on the basis that the prosecution had exercised its first four peremptory challenges against African-American venirepersons. *Reynolds*, No. 1-07-1944, slip op. at 27-28. The trial court found that petitioner failed to make a *prima facie* showing of purposeful discrimination, and denied the motion without requiring the prosecution to provide reasons for its use of the peremptory challenges. *Id.* at 29.

Of the first panel of fourteen venirepersons, the prosecution exercised its first two peremptory challenges to excuse African Americans. The prosecution did not exercise a peremptory challenge against the remaining African American on the panel, who was seated on the jury. The prosecution did not exercise peremptory challenges against the first two African Americans on the second panel, and they also were seated on the jury. The prosecution then exercised its third and fourth peremptory challenges against African Americans. When

defendant made his *Batson* motion, the prosecution had three remaining peremptory challenges which it had not used. At that time, 25 venirepersons had been questioned, 7 of whom (or 28%) were African American, fourteen were white, three were Hispanic, and one was of Middle Eastern descent.[4] Of the eleven jurors who had been selected at that time, three (or 27%) were African American.

The Illinois Appellate Court concluded that the trial court's decision was not against the manifest weight of the evidence. *See Reynolds*, No. 1-07-1944, slip op. at 29. The appellate court stated that its review of the record did not reveal any questions or statements during *voir dire* that could reasonably be said to have raised an inference of purposeful discrimination. *Id*. The court concluded that petitioner had not established a *prima facie* case based on the number of peremptory challenges exercised against African-American venirepersons, without more. *Id*. at 29-30.

Under *Batson*, the defendant first must establish a *prima facie* case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Bennett*, 592 F.3d at 791 (quoting *Batson*, 476 U.S. at 94). This burden is light, and may be satisfied by "offering a wide variety of evidence that raises a mere inference of a discriminatory purpose." *Id*. Still, this step is "an essential part of the *Batson* framework, and trial courts may justifiably demand that defendants carry this burden before requiring prosecutors to engage in the difficult

---

[4] These figures reflect a slight discrepancy. At trial, defense counsel told the court that 25 venirepersons had been questioned, and that 8 were African American, 14 were white, 3 were Hispanic, and 1 was of Middle Eastern descent. By the court's calculation, these numbers add up to 26. Petitioner explains in his habeas petition that one of the original 26 venirepersons, an African American, was excused for cause, leaving 25 remaining venirepersons, 7 of whom were African American. The court's conclusions are the same, whether there were 8 African Americans in a pool of 26, 7 in a pool of 25, or 8 in a pool of 25.

13

task of articulating their instinctive reasons for peremptorily striking a juror." *Id*.

One factor relevant to whether petitioner made a *prima facie* case of purposeful discrimination is whether there was a pattern of using strikes against African-American jurors, including "whether a disproportionate number of peremptory challenges were used to exclude members of a particular cognizable group." *Coulter v. McCann*, 484 F.3d 459, 464 (7th Cir. 2007) (citing *Batson*, 476 U.S. at 97); *U.S. v. Stephens*, 421 F.3d 503, 512 (7th Cir. 2005). The prosecutor's questions and statements during *voir dire* are also relevant to this analysis. *Coulter*, 484 F.3d at 464 (citing *Batson*, 476 U.S. at 97). Other relevant factors include whether there is a disparity between the percentage of African Americans on the jury, as compared to the venire; whether the victim and witnesses are African American; what percentage of peremptory challenges the prosecution used to strike African-American jurors; and whether the prosecution exhausted its peremptory challenges to exclude all African-American jurors. *See Bennett*, 592 F.3d at 791; *Franklin v. Sims*, 538 F.3d 661, 666 (7th Cir. 2008).

Here, the prosecution used all of its first four peremptory challenges to strike African-American venirepersons. The prosecution did not exercise peremptory challenges as to three other African-American venirepersons, although it had peremptories available at the time. Therefore, while the prosecution used a disproportionate number of its first four peremptory challenges to excuse African Americans, it did not exhaust its peremptories to exclude all African Americans. In addition, the percentage of African Americans on the jury was only slightly underrepresented as compared to the percentage of African Americans on the venire that was questioned. Other factors also support a conclusion that the prosecution did not use its peremptory challenges in a discriminatory manner: the prosecution did not ask questions during

14

*voir dire* that would support an inference of racial discrimination, and the police officers at whom petitioner pointed the gun were also African American.

Petitioner argues that the appellate court's conclusion was unreasonable because the prosecutor had noted to the trial court that the excluded African-American venirepersons were all unmarried, when three unmarried white individuals were seated on the jury. However, neither the trial court nor the Illinois Appellate Court cited this factor as a basis for finding that petitioner had failed to establish a *prima facie* case of discrimination. *See Bennett*, 592 F.3d at 792 (finding appellate court's application of *Batson* was not unreasonable, even though that court had erroneously relied on a trait that was shared by both excluded African-American and non-excluded non-African-American jurors, where the trial court had not relied on that trait and it was only a small part of the appellate court's analysis). This court concludes that petitioner has not established that the Illinois Appellate Court's decision was contrary to, or incorrectly applied the holding in *Batson*, or that the appellate court's decision was outside the bounds of permissible differences of opinion. Therefore, petitioner's *Batson* claim is denied.

IV.     *Certificate of Appealability*

Because the court is entering an order adverse to petitioner, the court must determine whether to grant him a certificate of appealability. *See* Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts. A certificate of appealability should issued only if petitioner has made a "substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). That is, petitioner must show that "reasonable jurists could debate whether (or, for that matter agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed

15

further.'" *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The court finds that petitioner has not met this burden, and accordingly declines to certify any issues for appeal.

**ORDERED:** The petition for writ of habeas corpus [7] is denied. The court declines to certify any issues for appeal. Case terminated.

ENTER:

_____
George W. Lindberg
Senior United States District Judge

DATED:   April 10, 2012